IN THE CIRCUIT COURT
FOR MONTGOMERY COUNTY, MARYLAND

| | |
|---|---|
| MIROWSKI FAMILY VENTURES, LLC<br>6605 Kenhill Road<br>Bethesda, MD 20817 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| BOSTON SCIENTIFIC CORP.<br>One Boston Scientific Place<br>Natick, Massachusetts 01760, | )<br>)<br>)<br>) |
| CARDIAC PACEMAKERS, INC.<br>4100 Hamline Avenue N<br>St. Paul, Minnesota 55112, | )<br>)<br>)<br>) |
| GUIDANT LLC<br>11711 North Meridian Street, Suite 310<br>Carmel, Indiana 46032 | )<br>)<br>)<br>) |
| AND | )<br>) |
| GUIDANT SALES LLC<br>4100 Hamline Avenue<br>New Brighton, Minnesota 55112-5798 | )<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

8173198V

**JURY TRIAL REQUESTED**

## COMPLAINT

Plaintiff Mirowski Family Ventures, LLC ("Mirowski"), by its attorneys,

for its Complaint, alleges as follows:

RECEIVED
FEB 22 2013
Clerk of the Circuit Court
Montgomery County, Md.

1.      Dr. Michel Mirowski invented the implantable cardioverter defibrillator ("ICD"),[1] received several patents, and, more than 25 years ago, granted an exclusive license to Defendants. The license benefitted both parties, with Defendants making billions in profits and Mirowski collecting a 3% royalty on Defendants' sales. To protect their mutual interests, Mirowski and Defendants agreed to cooperate as partners in defending the patents from infringers who sought to enter the multi-billion dollar ICD market. The relationship put billions of dollars in Defendants' coffers, but this was not enough. When Defendants saw an opportunity to further enrich themselves by depriving Mirowski of hundreds of millions of dollars in royalties and damages, they went behind Mirowski's back and struck a secret deal with St. Jude Medical, Inc. (the "Secret Settlement"). This, despite having agreed with Mirowski to work jointly to sue St. Jude for infringing Dr. Mirowski's patents. The Secret Settlement and Defendants' other wrongful conduct benefitted Defendants handsomely but caused Mirowski to suffer more than $570 million in damages. Mirowski brings this suit to right these wrongs and recoup what it is owed.

2.      Specifically, Defendants owe Mirowski:

- In excess of $235 million in damages that, as a result of Defendants' self-dealing Secret Settlement, became unavailable to Mirowski in a Delaware suit against St. Jude;

---

[1] ICDs treat abnormal heart rhythms, including ventricular fibrillation and are designed to prevent sudden cardiac death.

- In excess of $250 million in damages that, as a result of Defendants' self-dealing Secret Settlement, became unavailable to Mirowski in an Indiana suit against St. Jude;

- In excess of $80 million in unpaid royalties on ICDs Defendants sold from July 2002 through December 23, 2003;

- In excess of $5 million in unpaid attorney's fees and other litigation expenses incurred by Mirowski in ongoing litigation against Medtronic Corporation ("Medtronic") in Delaware, which are due to Mirowski under the parties' agreements; and

- Disgorgement of any profits Defendants realized from their self-dealing Secret Settlement.

3.      In total, Mirowski seeks more than $570 million in compensatory and restitutionary/disgorgement damages from Defendants, plus interest (including prejudgment interest), punitive damages, attorneys' fees and other litigation expenses, and the value of the unjust benefits Defendants gained as a result of their self dealing.

## JURISDICTION, VENUE AND PARTIES

4.      This Court has jurisdiction over the subject matter pursuant to Section 1-501 of the Courts and Judicial Proceedings Article of the Maryland Code.

5.      Plaintiff Mirowski is a limited liability company organized under the laws of Maryland with its principal place of business in Bethesda, Maryland. Mirowski is, for the purposes of this litigation, the owner of all rights and duties under the 1973 License and a party to the 2004 License described below.

3

6.    On information and belief, Defendant Boston Scientific Corporation ("Boston Scientific") is a Delaware corporation with its principal place of business at One Boston Scientific Place, Natick, Massachusetts.

7.    On information and belief, Defendant Cardiac Pacemakers, Inc. ("CPI"), now a wholly owned subsidiary of Boston Scientific, is a Minnesota corporation, having its principal place of business at 4100 Hamline Avenue, St. Paul, Minnesota.

8.    On information and belief, Defendant Guidant LLC, now a wholly owned subsidiary of Boston Scientific, is an Indiana corporation having its principal place of business in Indiana. Guidant LLC formerly conducted business as Guidant Corporation. On February 19, 2010, Guidant Corporation was converted into Guidant LLC under Indiana law.

9.    On information and belief, Defendant Guidant Sales LLC, now a wholly-owned subsidiary of Boston Scientific, is an Indiana corporation, having its principal place of business in Minnesota. Guidant Sales LLC formerly conducted business as Guidant Sales Corporation (Guidant Sales Corporation, Guidant Sales LLC, Guidant Corporation, and Guidant LLC are collectively referred to herein as "Guidant").

10.    On information and belief, on April 21, 2006, Boston Scientific acquired 100 percent of the equity of Guidant and CPI, at which time those entities became wholly-owned subsidiaries of Boston Scientific.

11.    After its acquisition of Guidant and CPI, Boston Scientific became their successor in interest and is responsible for the actions of those entities. Boston

4

Scientific, CPI, and Guidant are collectively referred to in this Complaint as "Defendants."

12.    Venue is proper in this court pursuant to Section 6-202 of the Courts and Judicial Proceedings Article of the Maryland Code, as no corporate defendant has a principle place of business in Maryland and Mirowski's principal place of business is in Montgomery County.

13.    This Court has general jurisdiction over Defendants, as, on information and belief, Defendants have extensive and systematic contacts with Maryland both related and unrelated to the contracts and torts at issue in this case. On information and belief, Defendants' contacts with Maryland are so regular and systematic that Defendants are subject to general personal jurisdiction in the Maryland courts.

14.    This Court has specific personal jurisdiction over Defendants under Section 6-103(b)(1), (2), (3), and (4) of the Courts and Judicial Proceedings Article of the Maryland Code, as Defendants transacted business in Maryland in connection with the subject matter of this lawsuit and contracted to provide goods, services, and manufactured products in Maryland.

<u>Factual Background</u>

I.    Dr. Mirowski's Groundbreaking Invention

15.    In 1966, Dr. Harry Heller's heart stopped beating. While he might have been saved by an external defibrillator available at most hospitals, he was away from the hospital at the time and died. His friend and colleague, Dr. Mieczyslaw (Michel) Mirowski, was grief-stricken. He immediately committed himself to inventing

what experts in his field said was impossible: an implantable cardioverter defibrillator that could have saved his friend. It took Dr. Mirowski more than a decade to realize his dream, but in the decades since ICDs have been on the market, they have saved tens of thousands of lives. *See, e.g.,* Kastor, JA, "Michel Mirowski and the Automatic Implantable Defibrillator," *Am. J. Cardiology* 1989; 63:977-82, 1121-26.

16.     Over the years, Dr. Mirowski and later his colleagues obtained several patents on his inventions relating to ICDs (the "Mirowski ICD Patents") and patents directed to cardiac resynchronization therapy ("CRT"), on which Dr. Mirowski's colleague and co-inventor, Dr. Morton Mower, is the inventor (the "Mirowski CRT Patents" and, collectively with the Mirowski ICD Patents, the "Mirowski Patents").[2]

17.     The Mirowski ICD Patents were a barrier to St. Jude entering the ICD market without a license.

18.     The Mirowski ICD Patents were a barrier to Defendants entering the ICD market without a license.

19.     The '288 patent was a fundamental patent in the ICD market.

20.     The '288 teaches that ICDs should continuously monitor the nature of an arrhythmia and selectively perform one of three modes of ICD therapy – antitachycardia pacing, cardioversion, or defibrillation – thereby allowing "multi-mode" or "tiered" therapy.

---

[2] The relevant patents included in the 1973 and 2004 License agreements include, but are not limited to, United States Patents Nos. 4,316,472 (the "'472 patent"), 4,407,288 (the "'288 patent"), RE38,119 (the "'119 patent") and RE39,897 (the "'897 patent").

21.     Claim 4 of the '288 patent specifies "at least one mode of operation of said implantable heart stimulator includes cardioversion."

22.     By the mid to late 1990's, tiered therapy had become the standard of care. All tiered therapy devices on the market provided for cardioversion as one mode of therapy. In 2002 and 2003, cardioversion was a critical and essential feature of any commercially viable ICD.

23.     As a practical matter, in 2002 and 2003, no company could successfully market an ICD that was not designed to practice claim 4 of the '288 patent.

24.     Dr. Mirowski's ICD inventions created a multi-billion dollar industry.

25.     The first ICD was sold in 1985. From 1985 through 2004, the market for ICDs grew from $150 million to nearly $4 billion per year.

26.     Dr. Mirowski's ICD inventions have saved or improved tens of thousands of lives.

27.     Dr. Mirowski's legacy to the world is written in the lives saved and livelihoods created by his ICD inventions.

II.     **Defendants License The Mirowski Patents and Reap Significant Profits**

28.     In 1973, Dr. Mirowski granted an exclusive license ("1973 License") to Medrad, Inc. for certain of the Mirowski Patents. In 1985, Medrad assigned that license to CPI. In 1994, CPI became a wholly owned subsidiary of Guidant which, as described above, later was purchased by Boston Scientific. As a result, Defendants have held an exclusive license to the Mirowski Patents since 1985.

29.   The 1973 License provided Defendants with an exclusive worldwide license to use and sublicense the Mirowski Patents. In exchange, Defendants agreed to pay a 3% royalty on their own ICD and CRT sales, as well as any sales made by their sublicensees.

30.   From 1997 through 2001, Defendants sold more than $2 billion worth of ICDs and leads. These sales continued to grow in later years. By 2004, Guidant had achieved a market capitalization of $20 billion and in 2006 was purchased by Boston Scientific for $27.3 billion.[3]

31.   Defendants also realized significant profits and other benefits from sublicenses of the Mirowski Patents they granted:

a.   In 1991, Defendants granted Medtronic a 3% royalty bearing sublicense to the Mirowski Patents; in exchange, Medtronic granted Defendants a royalty-free license to certain Medtronic patents. Defendants and Medtronic ultimately established a commanding market position in ICDs.

b.   In 1993, Ventritex agreed to pay a 6% royalty to Defendants (3% to Mirowski and 3% to Defendants), to pay Defendants $8.5 million in cash, and to grant Defendants a royalty free cross-license to Ventritex's patents, in exchange for a sublicense to certain Mirowski Patents.

---

[3]

http://money.cnn.com/magazines/fortune/fortune_archive/2006/10/16/8390284/index.htm

c.    In March 1994, Telectronics agreed to pay a 3% royalty and to grant a royalty-free cross license to Defendants on 200 Telectronics patents, in exchange for a sublicense to certain Mirowski Patents.

A.    **Mirowski and Defendants Agreed to Jointly Defend The Mirowski Patents Against Infringers**

32.    The 1973 License provided Dr. Mirowski and later Mirowski with specific protections if Defendants filed an infringement suit to protect their market share. This contract obligated Defendants to obtain Mirowski's "mutual agreement" to not only "bring" but also as to how to "conduct suit or actions against any infringer" with sales over $75,000.

33.    Mirowski had a contractual "right to participate" in any such action against an infringer.

34.    The 1973 License required Defendants to share any proceeds of litigation with Mirowski.

35.    If a suit was successful, the contract obligated Defendants to "divide[] equally" the proceeds, net of costs and expenses, with Mirowski:

> [GUIDANT][4] shall have the right to bring and conduct suit or actions in its name against others for infringement of any patent subject to this Exclusive License Agreement, the same as if such patent were the exclusive property of [GUIDANT]; and [GUIDANT] shall, subject to mutual agreement between [GUIDANT] and MIROWSKI, bring and conduct suit or actions against any infringer whose annual sales, rentals and leases of infringing devices exceed $75,000. MIROWSKI agrees to join as a party plaintiff in

---

[4] The 1973 License initially was between Dr. Mirowski and Medrad, Inc., Guidant's predecessor.

9

any infringement suit or action brought by [GUIDANT] under the terms of this Exclusive License Agreement; and MIROWSKI shall have the right to participate in any infringement suit or action brought by [GUIDANT] under the terms of this Exclusive License Agreement. [GUIDANT] shall pay all costs and expenses of such suit or action; and shall be entitled to the proceeds thereof. However, the proceeds of such suit or action, less all costs and expenses incurred by [GUIDANT] in connection therewith, shall be divided equally between [GUIDANT] and MIROWSKI.

1973 License, Article VIII, Section 2.

36. The phrase "the same as if such patent were the exclusive property of [GUIDANT]" used in the 1973 License gave Defendants legal standing to prosecute claims under the Mirowski Patents should Mirowski elect not to join a particular suit.

37. The phrase "the same as if such patent were the exclusive property of [GUIDANT]" used in the 1973 License did not give Defendants unfettered dominion over litigation they pursued on the Mirowski Patents.

38. The phrase "the same as if such patent were the exclusive property of [GUIDANT]" used in the 1973 License was not a license for Boston Scientific to disregard Mirowski's interests with respect to the Mirowski Patents.

39. On January 28, 2004, Guidant and Mirowski entered into a new license ("2004 License") containing the same language and imposing the same duties and obligations on Defendants.

40. Under both the 1973 License and the 2004 License, Defendants were contractually obligated to keep Mirowski informed and to obtain Mirowski's

10

agreement on the conduct of any litigation, and Defendants and Mirowski shared the risks and benefits of any litigation.

B.     **Defendants' Agreements With Mirowski Formed A Joint Venture to Pursue Litigation Against Infringers**

41.     In the 2004 License (and the 1973 License), Defendants and Mirowski agreed to share mutual control over litigation asserting the Mirowski Patents against infringers.

42.     In the 2004 License (and the 1973 License), Defendants and Mirowski agreed that each would bear certain risks in the litigation asserting the Mirowski Patents against infringers.

43.     In the 2004 License (and the 1973 License), Defendants and Mirowski agreed to share the benefits and profits awarded in litigation asserting the Mirowski Patents against infringers.

44.     Defendants and Mirowski had the same interests in maximizing their profits in this enterprise.

45.     The right of mutual control and the sharing of risk and benefits created a joint venture between Defendants and Mirowski with respect to any litigation Defendants undertook pursuant to the 1973 and 2004 Licenses.

46.     Pursuant to the 2004 License (and the 1973 License), Defendants and Mirowski were as partners with a fiduciary obligation to protect each other's interests relating to their joint venture.

47.     As a result of this joint venture, each party became an agent of the other's interests with respect to third parties.

11

III.    Mirowski and Defendants Jointly Defend the Mirowski Patents Against St.
        Jude

    A.    St. Jude Pays Hundreds of Millions of Dollars In a Failed Bid to Enter
          the Multi-Billion Dollar ICD Market

        48.    St. Jude began steps to enter the pacemaker market by acquiring

device manufacturers Pacesetter, Inc. in 1994 for $524 million and Daig, in 1996, for

$443 million.  To enable it to sell ICDs, in 1997 St. Jude acquired Defendants'

sublicensees Telectronics and Ventritex.

        49.    On information and belief, St. Jude believed that it had gained

rights under the Mirowski Patents when it purchased sublicensee Telectronics.

        50.    Between May 15, 1997 and March 31, 2001, St. Jude tendered $12

million in royalty checks to Defendants "due to Mrs. Mirowski."

        51.    Defendants refused St. Jude's royalty checks intended for

Mirowski.

        52.    On information and belief, Defendants decided that they were

better off blocking St. Jude from the ICD market, arguing that the Telectronics sublicense

had not transferred to St. Jude.

    B.    Defendants and Mirowski Sue St. Jude, Sharing the Risks and
          Benefits of Litigation

        53.    Defendants sued St. Jude in the Southern District of Indiana for

infringing the '472 and '288 patents (hereafter "Indiana Litigation").  Judge David

Hamilton presided over the Indiana Litigation in the District Court.

        54.    The decision to sue St. Jude carried risks for Mirowski.  The 1973

License limited royalties to devices covered by "valid" patent claims.  If, as a result of the

12

litigation, Mirowski's patents were invalidated, Defendants' royalties to Mirowski might stop. The decision to file suit also put royalties to Mirowski from Defendants' sublicensees and potential sublicensees, such as St. Jude, in jeopardy.

55.     For example, from 1997 through the expiration of the '288 patent on December 23, 2003, St. Jude sold more than $1.2 billion in ICDs and leads, which would have resulted in Mirowski receiving $36 million if Defendants had accepted St. Jude's royalty checks. Medtronic's ICD sales and royalty obligations to Mirowski during this same interval were even higher. Filing the lawsuit put all of this at risk.

56.     In order for the Indiana Litigation against St. Jude to be in Mirowski's interests, the anticipated proceeds had to exceed the risk of losing royalties Mirowski was already assured of receiving. Otherwise, the litigation would present Mirowski with a needless risk.

57.     At the trial of the Indiana Litigation, Defendants herein argued to the court and jury that it and Mirowski were entitled to $313 million in damages, including $179 million in lost profits, an up-front royalty payment of $100 million, and a running royalty of 13%, valued at $34 million. The potential economic benefit to Mirowski was half this amount, or $156 million.

58.     Five years later, in July 2006, Boston Scientific elected to settle six cases then pending between Defendants and St. Jude, two of which involved Mirowski Patents, including the Indiana Litigation mentioned above.

13

59. The July 2006 Secret Settlement, entered without Mirowski's knowledge or consent, described in more detail below, dramatically slashed any possible benefit to Mirowski from these two actions.

60. On information and belief, Defendants entered the Secret Settlement to eliminate hundreds of millions of dollars in claims made against them by St. Jude in cases that did not involve Mirowski and, purportedly, to protect themselves from embarrassment and other exposure arising out of their conduct during the Indiana Litigation. *See, e.g.,* ¶ 23 of Defts' Am. Compl. for Declaratory Judgment) (Doc. 9) ("In exchange [for Defendants' withdrawal of various claims], St. Jude agreed to withdraw its claims and defenses based on the alleged misconduct of an independent expert witness [Dr. Bourland] at the prior trial."). In that regard, it is important to understand in detail Defendants' wrongful conduct in that case, which is set forth below.

61. Had Mirowski known Defendants would disregard its contractual obligation to allow Mirowski to participate in decisions regarding settlement, Mirowski never would have proceeded in the joint venture regarding the Indiana and Delaware suits now at issue.

62. In the end, Defendants ultimately put their own interests above Mirowski's and disregarded their contractual responsibilities to Mirowski, and their fiduciary obligations arising from those contractual responsibilities to Mirowski, causing the damages described in these Counterclaims.

### C. Defendants and Mirowski Win June 2001 Trial Against St. Jude – But the
### Victory is Taken Away as a Result of Defendants' Dishonesty

63. The Indiana Litigation, which initially resulted in a hundred million dollar verdict in Mirowski's and Defendants' favor, should have been a successful litigation. Instead, because of Defendants' dishonest behavior toward the jury and the Court, it began a pattern of misconduct by Defendants that continues to this day and which has enriched Defendants and damaged Mirowski in excess of hundreds of millions of dollars.

#### 1. Defendants Offer to the Jury False Testimony of Their Lead Expert on Patent Validity

64. During that trial, Defendants' lead expert, Joseph D. Bourland testified falsely.

65. He did so, on information and belief, with the knowledge and silent approval of Guidant's in-house counsel.

66. At his pretrial deposition, Dr. Bourland was asked whether he had served as an expert witness in two patent cases then pending against Defendants' sublicensee, Medtronic: *Charms v. Medtronic* and *Moore v. Medtronic*.

67. During his testimony, which was offered by Defendants' counsel, Dr. Bourland testified that he had never submitted expert reports in *Charms* or *Moore*. In fact, in the months leading up to the June 2001 Indiana trial, Dr. Bourland had submitted expert reports in *Moore* on January 16, 2001 and March 1, 2001.

68.     In those reports, Dr. Bourland analyzed the same patents and prior art references that were asserted as invalidating references in the Indiana Litigation and made statements that directly contradicted his testimony in the Indiana Litigation.

69.     When Dr. Bourland took the stand on June 14, 2001, Defendants' trial counsel asked Dr. Bourland if he had ever been an expert witness before and he responded, "One time many, many years ago, but it was not a patent infringement suit."

70.     That afternoon, a lawyer for Dr. Moore brought Dr. Bourland's *Moore* report to the attention of St. Jude's trial counsel.

71.     When Defendants' counsel was confronted with Dr. Bourland's earlier report, he stated that he had "no information about [the *Moore*] lawsuit or about this expert report."

72.     Guidant later withdrew Dr. Bourland as its only expert on validity of the '472 and '288 patents, and informed the Court that he had travel plans that conflicted with his further appearance in the trial.

73.     Dr. Moore's counsel further advised St. Jude that Defendants' counsel had contacted him on June 4, 2001, a few days before the Indiana trial, seeking to postpone a June 6, 2001 deposition of Dr. Bourland in *Moore*, so that Dr. Bourland could prepare for his trial testimony in the Indiana Litigation, indicating Defendants' counsel had knowledge of Dr. Bourland's participation in the *Moore* case.

74.     Guidant nonetheless was able to persuade the Court to instruct the jury that Guidant's trial counsel had not previously been in possession of the report and that Dr. Bourland was not available to return for additional examination.

75.     During closing arguments on June 29, 2001, Guidant's counsel repeatedly told the jury that Dr. Bourland had "forgotten" about his expert report in *Moore*.

76.     These statements were later proven to be untrue.

77.     The jury found infringement of the '472 patent and jointly awarded Defendants and Mirowski $140 million in damages, including a $110 million up-front payment for entry into the ICD market and ongoing royalties of $30 million, but no lost profits.

78.     The jury found the '288 patent was valid but, according to the claim construction the jury was instructed to apply, not infringed.  The claim construction applied by the jury was later overturned on appeal.

**2.     Subsequent Discovery on Defendants' Knowledge of the *Moore* Reports Revealed That Defendants Had Misled the Court**

79.     Dr. Bourland was re-deposed by St. Jude after the Indiana trial. He testified that he had not forgotten about the *Moore* reports, but had deliberately given false testimony at trial.  He admitted to having drafted a third *Moore* report, dated May 1, 2001, and to having prepared reports in *Charms* as well.

80.     Dr. Bourland further testified that he told Defendants' trial counsel on June 26 that he would be back in Indiana on June 27, the same day the Court, at Defendants' counsel's request, informed the jury Dr. Bourland was "not available."

81.     St. Jude moved for a new trial "as a consequence of the deliberate suppression of highly relevant evidence by plaintiffs' principal expert witness, Joe. D. Bourland, Ph.D., as well as the actions of plaintiffs in failing to supplement the record,

17

soliciting false testimony, allowing the false testimony of this witness to stand

uncorrected, and plaintiffs' misstatements to the Court and to the jury about this matter."

82.     After Defendants denied any knowledge of Dr. Bourland's work

on *Moore*, St Jude obtained testimony from Defendants' sublicensee, Medtronic,

establishing that "Medtronic's in house legal staff [had] met with" Guidant's in house

legal staff to discuss *Moore* on March 30, 2001 and had given them the "two reports

prepared by Dr. Bourland" in *Moore*.

83.     St. Jude amended its post-trial pleadings to assert that Defendants

had knowledge of the *Moore* reports before trial, but falsely claimed not to know of them.

> Contrary to plaintiffs' representations, however, defendants
> have now learned that, before plaintiffs' counsel made
> those representations [of no knowledge of the *Moore*
> report] and before the Court stated to the jury that there was
> "no indication that CPI's counsel had the [*Moore v.
> Medtronic*] report before trial," [the] Vice President and
> General Counsel of plaintiff CPI and Deputy General
> Counsel of Guidant Corporation (*see* Trial Trans. at
> 1310:20-25), not only knew that Dr. Bourland was retained
> as Medtronic's expert in the *Moore* case, but actually had
> been given copies of Dr. Bourland's expert reports by
> Medtronic on March 30, 2001.

Second Supp. Mem. in Support of Def's Motion to Strike the Trial Testimony of Pl's

Expert Witness, Joe D. Bourland, or in the Alternative for a New Trial on Certain Issues

and Other Appropriate Relief (Doc. 836) at 3.

84.     St. Jude's allegations were now aimed squarely at Defendants:

> [The Vice President and General Counsel of CPI and
> Deputy General Counsel of Guidant Corporation] was very
> much "hands on" and "heavily involved" in plaintiffs'
> prosecution of this litigation. *See* Trial Trans. at 1423:11-
> 12. For example, not only did [he] appear as counsel for

18

plaintiffs and sit at counsel table during the entire trial (*see, e.g., id.* at 84, 603, 920, 3331, 3497), but he read and testified about the substantive pleadings and orders in the case (*see, e.g., id.* at 1388:8-24, 1423:15-17), attended the "vast majority" of the hearings in the case (*id.* at 1423:13-14), attended the "mock trial/jury research" preparation at which Dr. Bourland's trial testimony was prepared and presented (App. Tab 1, at 15:1-5, 158:4-159:13), was present during Dr. Bourland's extensive trial preparation in Indianapolis (*see id.* At 106:20-109:23), and was a participant in a conference with the Court in chambers during which Dr. Bourland's misconduct was addressed.

*Id.* at 5.

### 3. After Defendants' Misconduct was Exposed, the Court Took Away the Jury Verdict

85.   On February 13, 2002, the Court entered judgment as a matter of law against Guidant and Mirowski, took away the jury verdict, found both Mirowski patents invalid and non-infringed, awarded monetary sanctions of $376,917.63 against Guidant (which Guidant paid) and ordered Guidant to pay for all of St. Jude's costs, including attorney's fees, if a re-trial was required.

86.   In a July 5, 2002 Amended Entry on Post-Verdict Motions, the Court wrote:

> [T]he court grants St. Jude's motion for sanctions and for a conditional new trial as a result of the deception of CPI's expert witness, Dr. Joe D. Bourland. After the trial, Dr. Bourland admitted deliberately lying at trial and during his deposition so as to conceal matters that go to the heart of both his credibility and the merits of the case. Dr. Bourland's deception tainted the trial and rendered the partial but large verdict in favor of plaintiffs the product of an unfair proceeding.

July 5, 2002 Amended Entry on Post-Verdict Motions at 7.

87.     Defendants entered the Secret Settlement with St. Jude purportedly to protect Defendants from the repercussions of their and their expert's conduct.  On information and belief, the real reason Defendants entered into the Secret Settlement, which destroyed hundreds of millions of dollars worth of potential claims owned by Mirowski, was not to spare Guidant's Deputy General Counsel further "embarrassment," but rather to leverage the value in the Mirowski suits to eliminate hundreds of millions of dollars of claims Defendants were facing from St. Jude, in cases that had nothing to do with Mirowski or the Indiana or Delaware actions.

**D.     Defendants Stop Their Royalty Payments to Mirowski**

88.     After learning of the Court's February 13, 2002 decision to invalidate the '472 and '288 patents, counsel for Guidant met with counsel for Mirowski, on March 14, 2002.  Counsel for Guidant advised counsel for Mirowski there was an "even chance" on appeal of overturning the Court's invalidity decision on the '288 patent.

89.     Defendants' next quarterly royalty payment to Mirowski for royalties on its sales of ICD devices, in the amount of $5,765,181, was due on April 30, 2002.  On April 17, 2002, four weeks after the March 14, 2002 meeting, counsel for Guidant met with counsel for Mirowski again.

90.     This time, counsel for Guidant claimed the chances of success on appeal were only 20%, that an appeal was not worth pursuing, and that, because the Court had declared Mirowski's ICD patents to be invalid, Guidant was going to stop paying royalties to Mirowski on Defendants' ICD sales.

20

91.     On information and belief, the change in Guidant's assessment of the case was based on its realization that by abandoning the appeal it could save tens of millions of dollars in royalties that it otherwise owed to Mirowski.

92.     From January 1, 2002 through the expiration of the '288 patent on December 23, 2003, Defendants sold more than $1.4 billion worth of ICDs and leads and accrued – and withheld – $55,635,745 in royalties payable to Mirowski. Those accrued royalties, plus interest on them, are now at issue in this case.

93.     Mirowski obtained independent counsel, who, with Defendants' counsel, successfully appealed the Court's invalidity ruling on the '288 patent.

94.     At the end of the appellate process, claim 4 of the '288 ICD patent was found to be valid, enforceable, and infringed by St. Jude.

IV.    Defendants Promise Payments to Mirowski in Settlement of Claims Arising Out of Defendants' Prior Misconduct

95.     On January 28, 2004, while the Indiana case was on appeal, Mirowski and Defendants reached an agreement to settle claims between them "based on or arising from the [Indiana] litigation" and entered into a new 2004 License, with provisions similar to the 1973 License. The parties agreed that, if there was ultimately a final non-appealable judgment that St. Jude infringed a valid claim of the '288 patent, Defendants would "pay to [Mirowski] a sum equal to all royalties that accrued pursuant to the License Agreement . . . with interest at the prime rate . . . compounded quarterly from the date payment is due to the date of payment":

> In the event there is in the Litigation a final non-appealable judgment that St. Jude infringes a valid claim of the '288 Patent and that the '288 Patent is properly subject to the

21

previously granted patent term extension, GUIDANT will pay to Mirowski *a sum equal to all royalties that accrued pursuant to the License Agreement on products covered by any such claims of the '288 Patent from the date such royalty payments were suspended to the date of expiration of the '288 Patent together with interest at the prime rate* as published in the Wall Street Journal as compounded quarterly from the date payment is due to the date of payment. Such payment will be made by GUIDANT within ninety (90) days after such decision becomes final and not subject to further appeal.

January 28, 2004 Agreement § 4(c) (emphasis added).

96.     The Agreement provided for three possible outcomes:

a,  If there were a final judgment St. Jude did not infringe (whether by non-infringement or because an invalid claim cannot be infringed) and the term extension was adjudged to have been proper, Defendants agreed to pay $15 million., *id.* §4(d); or

b.  If there were a "final non-appealable judgment that the '288 Patent term extension was improperly granted," no payment was due, *id.* §4(e); or

c.  If there were a final judgment that St. Jude infringed a valid claim of the '288 patent, Defendants were to pay the full royalty owed under the 2004 License -- including interest.

97.     The third outcome occurred, yet Defendants nonetheless refused to pay the full royalty owed.

98.     The payments served as consideration for Mirowski's agreement to release Defendants from then-existing claims relating to Defendants' misconduct during the 2001 Indiana trial.

99.     By refusing to make the required payments, Boston Scientific breached the January 28, 2004 Agreement.

**V.     Guidant Initiates a Separate Action Against St. Jude in Delaware**

100.     On February 2, 2004, Guidant initiated a separate action against St. Jude in Delaware, asserting that St. Jude infringed Mirowski's '119 patent, which was based upon an invention by Dr. Morton Mower, a renowned inventor and former collaborator and co-inventor with Dr. Mirowski (a different Mirowski Patent than those at issue in Indiana).

101.     The technology at suit in Delaware was known as cardiac resynchronization therapy or CRT. CRT therapy uses a CRT pacemaker to treat congestive heart failure.

102.     On information and belief, by 2003, CRT products were a great commercial success, with total sales in excess of $1 billion and forecasts for steep annual growth. Here again, Defendants were earning substantial profits from its sales of CRT devices and paying Mirowski a 3% royalty.

103.     There were three suppliers of CRT devices in 2004 – Medtronic, Defendants, and St. Jude. All CRT devices sold by these companies incorporated technology claimed in both the '119 patent and, from October 23, 2007 forward, Mirowski's '897 patent.

104.     From May 2004 to December 2005, St. Jude's sales of CRT devices that infringed a Mirowski Patent amounted to $560 million. From January 1,

2006 through the expiration of the '119 and '897 patents on January 23, 2009, St. Jude's sales of CRT devices increased.

105.    When, pursuant to its agreement with Mirowski in the 2004 License, Defendants sued St. Jude in Delaware (hereafter the "Delaware litigation"), they assumed the same contractual obligations, including but not limited to fiduciary and other obligations, in the conduct of the Delaware Litigation that they had under the earlier 1973 License and in the then ongoing Indiana Litigation.

106.    The damages Defendants sought in the Delaware Litigation were even greater than those claimed in the Indiana Litigation.

VI.    **In Appeal of Indiana Litigation, Court of Appeals Upholds Validity of '288 Patent and Remands for Trial on Damages – But Defendants Fail to Pay Full Royalties to Mirowski as Promised**

107.    While the Delaware Litigation was proceeding, Mirowski and Defendants continued with their efforts, on appeal, to overturn the adverse rulings that had been rendered in the Indiana Litigation.

108.    The Federal Circuit ultimately reinstated the Indiana jury's finding that method claim 4 of the '288 patent was valid, denied St. Jude's challenge to the patent term extension on the '288, and "remand[ed] for a new trial of infringement and reassessment of damages." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1374 (Fed. Cir. 2004).

109.    On remand, St. Jude argued that, since only a method claim remained, infringement damages against St. Jude should be limited to ICDs that actually

performed the method claim, *i.e.*, those devices that performed cardioversion after implantation.

110.   The Court agreed, limiting St. Jude's "infringement liability" to those devices that actually performed cardioversion. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,* 418 F. Supp. 2d 1021, 1040-41 (S.D. Ind. 2006) (noting "distinction between method and apparatus claims for purposes of infringement liability"). The Federal Circuit affirmed this ruling.

111.   The Federal Circuit's ruling concerning "infringement liability" did not establish the upper limit of the damages Defendants and Mirowski could have sought on remand.

112.   When determining reasonable royalty damages in the patent context, juries gauge, *inter alia*, the royalty the infringer would have paid in a "hypothetical negotiation" with the patent holder. In such a negotiation, Mirowski and Defendants would have had the upper hand, as they could have enjoined St. Jude from selling *any* ICDs (as described below).

113.   As noted above, the '288 patent was a barrier to St. Jude entering the ICD market. St. Jude already had paid hundreds of millions of dollars trying to enter the ICD market.

114.   At a retrial, Defendants and Mirowski would have established that St. Jude would have paid hundreds of millions of dollars more to obtain a sublicense on the Mirowski Patents.

VII.   Guidant Enters Into a Self-Dealing Secret Settlement with St. Jude,
       Depriving Mirowski of More than $300 Million

        115.    In 2006, Defendants were faced with three lawsuits by St. Jude that

exposed them to hundreds of millions of dollars in potential damages, the threat of

injunctions, and millions of dollars in legal fees and expenses: (a) *Pacesetter, Inc., et al,*

*v. Cardiac Pacemakers, Inc. et al.,* Case No. 02-1337 DWF/SRN (D. Minn.) (the

"Minnesota Pacesetter case"); (b) *Advanced Neuromodulation Systems, Inc. v. Advanced*

*Bionics Corp.,* Civil Action No. 4:04cv131 (E.D. Tex.) (with affiliated cases, the

"ANS/ABC cases"); and (c) *Pacesetter, Inc. v. Intermedics, Inc., et al.,* Case No. CV 06-

3166 GHK(FFMx) (C.D. Cal.) (the "California case").

        116.    In the Minnesota Pacesetter case, counsel for CPI (a Boston

Scientific party and one of the Defendants herein) described the suit to the federal court

on February 10, 2003 as "a huge patent infringement case Your Honor . . . It covers every

single pacemaker and defibrillating device sold by [CPI]." *See Pacesetter, Inc. et al. v.*

*Cardiac Pacemakers, Inc. et al.,* Civil Action No. 02-cv-1337 (D. Minn.), Doc. 59, p.5,

lines 3-7.

        117.    Boston Scientific reported pacemaker and defibrillator revenues of

$1.6 billion in 2002 alone (the year the suit was filed).

        118.    Counsel for Pacesetter (the St. Jude party), in discussing the

pending expert reports in that case in April, 2006, told the Court, "the numbers in this

case are going to be substantial.  We're going to have very, very big numbers." *Id.,* Doc.

271, p. 29, lines 3-6.

119.    Several months later, as part of the July 29, 2006 Secret Settlement, St. Jude agreed to dismiss this case, in exchange for the concessions made by Boston Scientific in the cases in which Mirowski was a co-plaintiff.

120.    In the ANS/ABC cases, ANS (the St. Jude Party) submitted an expert report in 2005 estimating damages against ABC (the Boston Scientific party) to be between $319 million and $534 million, before adding prejudgment interest. *See Advanced Neuromodulation Systems, Inc. v. Advanced Bionics Corp.,* Civil Action No. 4:04-cv-131 (E.D. Tex.), Doc. 202, Exhibit B.

121.    On April 21, 2006, Boston Scientific Corporation acquired Guidant.

122.    Several months later, as part of the July 29, 2006 Secret Settlement, St. Jude agreed to drop the Minnesota Pacesetter, ANS/ABS and California cases in exchange for Defendants' agreement to drop claims in the cases where Mirowski was a co-plaintiff

123.    Defendants' conduct eliminated Mirowski's share of the parties' claims against St. Jude, which were worth more than $360 million.

A.    Defendants Acted in Bad Faith by Settling with St. Jude in Secret

124.    In June, 2006, Defendants and St. Jude agreed to negotiate a resolution of the three cases St. Jude had against Defendants, including the Minnesota Pacesetter and ANS/ABC cases noted above, in exchange for full or partial settlements of the three cases Defendants had against St. Jude, including the Indiana and Delaware actions.

27

125.    On July 29, 2006, Defendants, without consulting or seeking the mutual agreement of Mirowski, entered into full or partial settlements with St. Jude of all six cases then pending between Boston Scientific and St. Jude.

126.    In entering this Secret Settlement, Defendants, without seeking Mirowski's agreement or consent, gave up over $700 million worth of potential claims that Defendants and Mirowski were jointly pursuing against St. Jude, leveraging that value to eliminate hundreds of millions of dollars of exposure Defendants faced in suits unrelated to Mirowski's patents.

127.    In exchange for the Secret Settlement, St. Jude gave up claims it had against Defendants in matters in which Mirowski was not involved.  Those claims were of equal or greater value than the more than $700 million in claims Defendants and Mirowski had against St. Jude,

128.    Defendants benefitted from the Secret Settlement by eliminating hundreds of millions of dollars in potential claims asserted against them in the Minnesota Pacesetter, ANS/ABS and California cases.

129.    The Secret Settlement provided no benefit to Mirowski.

130.    The Secret Settlement markedly reduced the damages Mirowski would have recovered in the Delaware and Indiana Litigations, leaving Mirowski in a far worse position than it would have been if Defendants had never pursued these suits in the first instance.

131.    Entering into the Secret Settlement breached Defendants' duties to Mirowski under the 1973 License and 2004 License.

132.    On information and belief, St. Jude hesitated to enter the Secret Settlement because it had concerns about Mirowski's position on issues relating to the litigation.

133.    On information and belief, to help assuage St. Jude's concerns, Defendants advised St. Jude to send a representative to visit Mirowski's counsel under the guise of seeing if a settlement could be reached between Mirowski and St. Jude.

134.    On information and belief, the meeting was a pretext to allow St. Jude and Defendants to gain intelligence on Mirowski's litigation strategy and thereby identify issues St. Jude later demanded to have addressed in the Secret Settlement.

135.    Counsel for Mirowski met with counsel for St. Jude and explained the exposure and specific problems that St. Jude faced in both the Indiana and Delaware Litigations. Several weeks later, Mirowski learned that Defendants had entered into the Secret Settlement now at issue, which gave up the very items Mirowski had explained would be most problematic for St. Jude in those cases.

136.    In the Secret Settlement, Boston Scientific and St. Jude recited that the "St. Jude parties entered into discussions with representatives of Mirowski (as defined below) in an effort to resolve the Indiana and Delaware cases, but the St. Jude Parties' efforts at negotiating a resolution of those cases with the representatives of Mirowski were unsuccessful." In fact, St. Jude never offered Mirowski a penny to settle either case. The allegedly unsuccessful "negotiations" consisted of Mirowski describing the problems that St. Jude faced and St. Jude and Boston Scientific (Mirowski's supposed

29

partner), in turn, using that information to strike a deal that eliminated those problems and destroyed substantial value in the two cases for Mirowski.

137.    In the Secret Settlement, Defendants gave up claims against St. Jude in Indiana and Delaware for lost profits, price erosion, "up front" royalty payments, prejudgment interest, attorney's fees and any royalties above "three percent (3%)" of net sales.

138.    In order to ensure that St. Jude received the benefits of this improper bargain, Defendants agreed to defend and indemnify and to hold St. Jude "harmless" if the Indiana and Delaware cases were not conducted in accordance with the terms of the Secret Settlement.

139.    In exchange for benefits to Defendants (and not Mirowski) in unrelated lawsuits, the Secret Settlement eliminated the potential benefit that Mirowski once had from the pursuit of these cases, limiting Mirowski to a *maximum* recovery of 3% – the same amount it initially had a right to collect from a sublicensee under the 1973 License had it never engaged in litigation and put its patent rights at risk – which Mirowski would have to then fight to obtain.

**B.    The Secret Settlement Injured Mirowski but Benefitted Defendants**

140.    The impact of the Secret Settlement on Mirowski's rights was profound.  In the Indiana Litigation, the Secret Settlement deprived Mirowski of approximately $250 million to which it would have been entitled, according to the calculations and testimony of Defendants' own expert.

141.    The Secret Settlement had an even greater impact on Mirowski in the Delaware Litigation.

142.    There, the Secret Settlement deprived Mirowski of more than $265 million to which it would have been entitled, according to the methods and earlier calculations of Defendants' own expert.

143.    In the Secret Settlement, Defendants and St. Jude agreed that Mirowski could keep whatever settlement Mirowski could subsequently obtain, if any, from St. Jude in the Indiana and Delaware cases.

144.    Despite subsequent confidential settlements between Mirowski and St. Jude, the value of these settlements was drastically reduced because of the Secret Settlement.

145.    By undertaking the Secret Settlement, Defendants engaged in a deliberate breach of the 2004 License, in which they placed their own interests above those of Mirowski and in which they anticipated that their own profits from the breach would likely exceed Mirowski's provable loss.  On information and belief, the Secret Settlement resulted in a gain to Defendants (net of potential liability in damages to Mirowski) that was greater than what Defendants would have realized from honoring their contractual obligations to Mirowski.

146.    In July 2006, Defendants hid from Mirowski their decision to stipulate away the bulk of the claims that Defendants and Mirowski were jointly pursuing in Indiana and Delaware in order to avoid any effort by Mirowski to stop or enjoin the Secret Settlement.

147.    When Mirowski was ultimately confronted with the Secret Settlement, Mirowski entered into a reservation of rights agreement with Boston Scientific on October 2, 2006.

148.    Regarding the Indiana case, the extent of the loss Mirowski suffered due to the Secret Settlement was contingent upon a final determination that the '288 patent was valid and enforceable.  In 2009, the Federal Circuit held, en banc, that claim 4 of the '288 was valid.   That determination became final when the United States Supreme Court denied certiorari on January 8, 2010.

149.    Regarding the Delaware case, the extent of the loss Mirowski suffered due to the Secret Settlement was contingent upon St. Jude's sales of CRT devices.

150.    On July 24, 2009, Boston Scientific and Mirowski entered into a Litigation Tolling Agreement.  On June 27, 2011, Boston Scientific served notice of its intent to terminate the tolling agreement three months hence, on September 28, 2011.

**VIII.   Defendants Wrongfully Withhold Royalty Payments Due to Mirowski under Their Licenses**

151.    Despite Mirowski prevailing on the appeal in the Indiana Litigation, Defendants refused to pay the full royalties they owe under the January 28, 2004 Agreement.

152.    The District Court and Court of Appeals rulings in the Indiana Litigation addressed only the measure of damages available against an infringer.

153.    The courts' decisions did not address the relationship between Defendants and Mirowski as licensee and licensor.

154.     Following these decisions, however, Boston Scientific – which had already accrued on its books more than $55 million in royalties to Mirowski on ICDs that Defendants had sold in 2002 and 2003 – suddenly claimed it should be allowed to take advantage of the Courts' rulings concerning infringement by St. Jude and, in effect, be treated as an infringer instead of a licensee for purposes of establishing their liability under the January 28, 2004 Agreement and only pay royalties on the percentage of sales that Defendants estimated would result in actual triggering of defibrillators implanted in patients.

155.     At the same time, Boston Scientific continued to accrue on its books both the complete $55 million royalty and interest at the prime rate.

156.     As of January 22, 2009, for example, the Mirowski accrual on Boston Scientific's books was more than $78,000,000 (including unpaid royalties and interest).

157.     On September 10, 2010, after the Indiana appeal became final, Boston Scientific tendered a check to Mirowski for $5,291,279.59, representing royalties, with accrued interest, on "10% of [its] U.S. sales" from July 5, 2002 through December 11, 2003.

158.     After realizing that it had ignored royalties from the first half of 2002, Boston Scientific paid another $1,384,241.79, again claiming it only owed a royalty on 10% of its 2002 and 2003 U.S. sales. Boston Scientific's aggregate payment of $6,675,521.38 left unpaid a remaining accrued royalty, with interest, to Mirowski of more than $80 million.

33

A.   **Defendants Owe Mirowski the *Full* Royalties on Defendants 2002 and 2003 ICD Sales Because the 2002 and 2003 ICD Sales Were "Covered" by a Valid Claim of the '288 Patent**

159.   Defendant have withheld millions of dollars in royalty payments due to Mirowski, arguing that only 10% of their 2002 and 2003 ICD sales are "covered" products under the 2004 Agreement.

160.   Under their agreements with Mirowski, however, all of Defendants' 2002 and 2003 sales are "covered."

161.   In the 2004 Agreement, Defendants agreed to pay Mirowski either:

a.   $15 million if the '288 patent were held invalid or unenforceable; or

b.   A 3% royalty on their sales of ICDs "covered by any [valid] claim of the '288 Patent."

162.   The $15 million payment was designed by the parties to be the minimum payment under the Agreement. It set a guaranteed minimum consideration, in exchange for which Mirowski agreed to release certain claims against Guidant.

163.   Defendants had accrued approximately $55 million to pay the royalties owed under the 2004 Agreement.

164.   Defendants' accrual of $55 million is an admission that they thought the full royalty was owed if and when claim 4 of the '288 was ruled to be valid.

165.   Absent the 1973 License, Mirowski could have enjoined all of Defendants' 2002 and 2003 ICD sales.

166. A patent holder has "the right to exclude others from making, using, offering for sale, or selling the invention" for the term of the patent. 35 U.S.C. § 154(a)(1). The exclusionary right is the heart of the patent protection.

167. A patent claim "covers" a device if the "exclusionary right" applies.

168. Demand for Defendants' ICDs was driven by the fact that they were capable of performing cardioversion as part of a tiered therapy.

169. Defendants designed their ICDs to perform cardioversion.

170. Defendants specifically instructed purchasers on how to perform the patented method set forth in claim 4 of the '288 patent.

171. Defendants specifically directed physicians perform all of the steps found in claim 4 of the '288 patent.

172. On information and belief, physicians followed Guidant's explicit instructions.

173. Absent the 1973 License, Defendants' actions would have actively induced infringement of the '288 patent.

174. Method claim 4 of the '288 patent "covered" all of Defendants' sales.

175. Absent the 1973 License, Mirowski could have enjoined all sales of Defendants' ICDs in 2002 and 2003 because at the time of their sale, it would have been impossible to know which specific devices would later use the cardioversion method.

176.   Absent the 1973 License, Defendants' ICD sales in 2002 and 2003 sales would have knowingly induced infringement of a valid method claim of the '288 patent.

177.   Mirowski could have blocked all of Defendants' sales if the 1973 License Agreement had not allowed the sales in exchange for a 3% royalty.  As a result, the Mirowski Patents and the corresponding License "covered" all of Defendants' ICD sales.

**B.   Defendants Owe Mirowski the Full Royalties on Defendants 2002 and 2003 ICD Sales Because Defendants' Obligation to Pay is Measured by What Would Have Accrued Under the 1973 License**

178.   The two-page January 28, 2004 Agreement created only two conditions for payment of accrued royalties:  (1) a final non-appealable judgment that "St. Jude infringes a valid claim of the '288 Patent" and (2) that the '288 patent term extension was proper.  Both conditions were met here.  Defendants' liability to Mirowski, while triggered by a finding that "St. Jude infringes," is determined by the terms of the 1973 License, not the scope of damages that St. Jude, an infringer, was ultimately obligated to pay.

179.   The Court's March 26, 2007 finding that St. Jude's devices infringed method claim 4 of the '288 patent became final when St. Jude did not appeal.

180.   The January 28, 2004 Agreement requires Mirowski and Defendants to now assume method claim 4 of the '288 was valid for purposes of calculating accrued royalties under the 1973 License.  Both the 1973 License and the

January 28, 2004 Agreement, in turn, look to whether devices were "covered" by the valid patent claim.

181.   The January 28, 2004 Agreement requires Defendants to pay "MIROWSKI a sum equal to all royalties that accrued pursuant to the License Agreement on products covered by any [valid] claim of the '288 Patent."

182.   The 1973 License required Guidant to pay a 3% royalty on "the initial sale of a device" with payment "due thirty (30) days following the end of each fiscal quarter" for sales "during such fiscal quarter." The '288 method claim "covered" those "initial sales" because, absent the 1973 License, those sales would have induced infringement, both at the time of implantation and subsequent to implantation, and could have been enjoined at the outset.  Mirowski gave up the right to enjoin such sales when it granted an exclusive license; in exchange, it received the right to a royalty on all of those sales.  The license did not hold "coverage" determination in abeyance.

183.   Because, absent the 1973 License, all of the "initial sales" could have been enjoined on the basis of the '288 method claim, they are "covered" by that method claim and subject to a royalty.  Guidant admitted this at the time by formally accruing royalties to Mirowski on all of its ICD sales.

184.   With interest, after taking Defendants' two partial payments into account, the amount now owed Mirowski for this breach alone is in excess of $80 million.

IX.     Defendants Breach their Promise to Pay Attorney's Fees and Other
        Litigation Expenses in the Medtronic Action in Delaware

185.    Under the 2004 License, Defendants are financially responsible for
ensuring that their sublicensees pay Mirowski a 3% royalty. That includes an obligation
to defend actions brought by infringers and pay for actions Mirowski has had to prosecute
to recover sublicensing revenue, including legal fees, expert fees, costs, and expenses.

186.    Pursuant to the parties contracts, Guidant had defended, at no
expense to Mirowski, a previous declaratory action filed by Medtronic with respect to
certain Medtronic products.

187.    In October 2007, Mirowski provided Medtronic a list of patent
claims that were infringed by a subsequent series of Medtronic products.

188.    On December 17, 2007, Medtronic — Defendants' sublicensee —
filed a declaratory judgment action against Boston Scientific and Mirowski in Delaware,
asserting that its products did not infringe the '119 patent and, more recently, the '897
patent. Mirowski filed a permissive counterclaim seeking sublicensing royalties owed to
Mirowski and held in escrow on the '288 patent.

189.    Defendants paid the first invoice for fees and expenses Mirowski
incurred in the 2007 Medtronic action, but they later refused to defend or pursue the
action or cover Mirowski's costs in doing so.

190.    After Defendants refused to abide by their promise to pay,
Mirowski litigated — and continues to litigate — the action at its own expense. Current
legal fees, costs and expenses, including expert fees and trial expenses, are more than $5
million and mounting.

38

### First Counterclaim
#### (Breach of Contract – Accrued Royalties)

191.    Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

192.    The January 28, 2004 Agreement was a binding, enforceable contract between Mirowski and Guidant, and remains in effect.

193.    Mirowski performed, and at all times stood and stands ready to perform its obligations under the January 28, 2004 Agreement.

194.    There was a "final non-appealable judgment that St. Jude infringe[d] a valid claim of the '288 Patent and that the '288 Patent [was] properly subject to the previously granted patent term extension." January 28, 2004 Agreement, ¶ 4(c).

195.    This finding obligated Boston Scientific to pay Mirowski "a sum equal to all royalties that accrued pursuant to the License Agreement on products covered by any such claim of the '288 Patent from the date such royalty payments were suspended to the date of expiration of the '288 Patent together with interest at the prime rate as published in the Wall Street Journal as compounded quarterly from the date payment is due to the date of payment. Such payment will be made by [Boston Scientific] within ninety (90) days after such decision becomes final and not subject to further appeal." January 28, 2004 Agreement, ¶ 4(c)

196.    The conditions precedent to payment were met.

197.    Guidant, and its parent Boston Scientific, breached the January 28, 2004 Agreement by failing to pay the accrued royalties due to Mirowski once those conditions were met.

198.    To date, Boston Scientific still has not paid the royalty payments due to Mirowski. Defendants' aggregate payment of $6,675,521.38 left unpaid a remaining accrued royalty, with interest, in excess of $80 million. As a result, Boston Scientific has breached its January 28, 2004 Agreement and injured Mirowski.

### Second Counterclaim
**(Breach of Contract – Improper Settlement)**

199.    Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

200.    The 1973 License and 2004 License (collectively, "Licenses") are binding, enforceable contracts between Defendants and Mirowski.

201.    Mirowski performed, and at all times stood and stands ready to perform its obligations under the Licenses.

202.    The Licenses provided Defendants with an exclusive worldwide license to use and sublicense the Mirowski Patents. In exchange, Boston Scientific agreed to provide consideration in the form of a 3% royalty on its own ICD sales, as well as any sales made by Defendants' sublicensees.

203.    The Licenses limited Defendants' ability to conduct litigation, as it required the "mutual agreement" of Mirowski in the conduct of "actions against any infringer."

204.   The Licenses also granted Mirowski "the right to participate in any infringement suit or action brought by" Defendants.

205.   Defendants' Secret Settlement with St. Jude, agreed to on July 29, 2006, breached the contracts with Mirowski under the Licenses.

206.   By agreeing to the Secret Settlement with St. Jude, Defendants breached their agreement with Mirowski by, *inter alia*, not obtaining Mirowski's "mutual agreement" in the "conduct" of its actions against an infringer, St. Jude.

207.   By agreeing to the Secret Settlement with St. Jude, Defendants breached their agreement with Mirowski by, *inter alia*, failing to provide Mirowski the ability to "participate" in the infringement suit against St. Jude.

208.   Defendants benefitted from the Secret Settlement; Mirowski did not. As a result of the Secret Settlement, Defendants avoided hundreds of millions of dollars in potential damages, fees and expenses from three separate, unrelated suits brought against them by St. Jude and further damages and embarrassment from Dr. Bourland's testimony in the Indiana Litigation and its conduct vis-à-vis Dr. Bourland.

209.   Defendants received value from St. Jude for the settlement of litigation not involving Mirowski, in exchange for forfeiting claims of which Mirowski owned fifty percent (50%).

210.   On information and belief, Defendants attempted to deceive Mirowski and acted oppressively, with malice, or gross negligence toward Mirowski in entering into the Secret Settlement.

41

211.   But for the Secret Settlement, Mirowski would have been entitled to recover its share of damages claims in the amount of at least $250 million in the Indiana Litigation. Instead, as a result of the lost value of the claims from Defendants' actions, Mirowski collected a fraction of that amount in a settlement with St. Jude. Therefore, Mirowski suffered damages from the Secret Settlement from claims related to the Indiana Litigation.

212.   In the Secret Settlement, Defendants also forfeited claims for an up-front royalty of $110 million and a running royalty of 13% from St. Jude in the Indiana Litigation. Mirowski's loss of its share of these damages is also the result of Defendants' breach.

213.   In the Secret Settlement, Defendants forfeited Mirowski's right to collect lost profits, price erosion, "up front" royalty payments, treble damages, attorney's fees, prejudgment interest, and any claim to royalties in excess of 3% in the Delaware Litigation. These claims had a value to Mirowski of at least $235 million. Instead, Mirowski collected a significantly lower payment in a settlement with St. Jude. Therefore, Mirowski suffered damages from the Secret Settlement from claims related to the Delaware Litigation.

214.   But for the Secret Settlement, Mirowski would have pursued and been awarded the damages described herein.

215.   In the alternative, but for the Secret Settlement, Mirowski could have settled its disputes with St. Jude for a more lucrative amount than the amount actually received.

### Third Counterclaim
### (Breach of Contract – Joint Venture)

216.    Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

217.    Under both the 1973 License and the 2004 License, Defendants were contractually obligated to keep Mirowski informed and to obtain Mirowski's agreement on the conduct of any litigation, and Defendants and Mirowski shared the risks and benefits of any litigation.

218.    In the 2004 License (and the 1973 License), Defendants and Mirowski agreed to share mutual control over litigation asserting the Mirowski Patents against infringers.

219.    In the 2004 License (and the 1973 License), Defendants and Mirowski agreed that each would bear certain risks in litigation asserting the Mirowski Patents against infringers.

220.    In the 2004 License (and the 1973 License), Defendants and Mirowski agreed to share the benefits and profits awarded in litigation asserting the Mirowski Patents against infringers.

221.    Defendants and Mirowski had the same interests in maximizing their profits in this enterprise.

222.    The right of mutual control and the sharing of risk and benefits created a joint venture between Defendants and Mirowski with respect to any litigation Defendants undertook pursuant to the Licenses.

223.    The 2004 License established Defendants and Mirowski as co-venturers with a fiduciary obligation to protect each other's interests relating to their joint venture and to deal with each other with the utmost good faith and honesty.

224.    As a result of this joint venture, each party became an agent of the other's interests with respect to third parties.

225.    But for the Secret Settlement, Mirowski would have been entitled to recover its share of damages claims in the amount of at least $250 million in the Indiana Litigation. Instead, as a result of the lost value of the claims from Defendants' actions, Mirowski collected a fraction of that amount in a settlement with St. Jude. Therefore, Mirowski suffered damages from the Secret Settlement from claims related to the Indiana Litigation.

226.    In the Secret Settlement, Defendants also forfeited claims for an up-front royalty of $110 million and a running royalty of 13% from St. Jude in the Indiana Litigation. Mirowski's loss of its share of these damages is also the result of Defendants' breach.

227.    In the Secret Settlement, Defendants forfeited Mirowski's right to collect its portion (50%) of any lost profits, price erosion damages, "up front" royalty payments, treble damages, attorney's fees, and prejudgment interest, and any claim to royalties in excess of 3% in the Delaware Litigation. These claims had a value to Mirowski of at least $235 million. Instead, Mirowski collected a significantly lower payment in a settlement with St. Jude. Therefore, Mirowski suffered damages from the Secret Settlement from claims related to the Delaware Litigation.

228. Mirowski is entitled to 50% of the joint venture's gains and assets, including 50% of the value received by Defendants in the Secret Settlement.

229. But for the Secret Settlement, Mirowski would have pursued and been awarded the damages described herein. In the alternative, but for the Secret Settlement, Mirowski could have settled its disputes with St. Jude for a more lucrative amount.

### Fourth Counterclaim
**(Breach of Implied Covenant of Good Faith and Fair Dealing – Improper Settlement)**

230. Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

231. Mirowski and Defendants maintained contractual relationships under the Licenses and the 2004 Agreement.

232. The 2004 License included an implied covenant of good faith and fair dealing between Defendants and Mirowski. Because, *inter alia*, the proceeds of infringement suits were to be divided equally between Defendants and Mirowski and because such suits were subject to "mutual agreement" and Mirowski had the right to "participate" in any such litigation, the 2004 License obligated Defendants to act in good faith and deal fairly with Mirowski.

233. The implied covenant of good faith and fair dealing was created during the more than thirty years of the relationship between Mirowski (and its predecessors) and Defendants (and their predecessors). The relationship between the parties was based on the trust that Defendants, as the exclusive Licensee of the Mirowski

45

patents, would pursue the parties' mutual interests. The parties affirmed their common purpose in the 1973 and 2004 Licenses.

234. The implied covenant of good faith and fair dealing was created by the formation of the joint venture between Defendants and Mirowski, under which the parties agreed to pursue their mutual interests through mutual control of litigation to enforce rights under the Mirowski Patents, with the intent to share the profits that resulted from that joint venture. Thus, Defendants became agents of Mirowski.

235. Mirowski agreed to risk its royalties and place its patents at risk in litigation against St. Jude because Defendants agreed to protect Mirowski's interests and proceed in a mutually beneficial course during the joint venture.

236. Defendants' Secret Settlement with St. Jude did not, however, protect Mirowski's interests. Instead, it reduced the value of Mirowski's claims while providing no benefit to Mirowski.

237. On information and belief, prior to settling with St. Jude, Defendants asked St. Jude to send a representative to meet with Mirowski.

238. After Mirowski explained the exposure and problems St. Jude faced in the Indiana Litigation and Delaware Litigation, St. Jude and Defendants used this information to draft a settlement that harmed the value of Mirowski's claims without consideration to Mirowski.

239. Defendants' Secret Settlement with St. Jude was made in bad faith or, at a minimum, was commercially unreasonable and was not disclosed to Mirowski.

240. Defendants' Secret Settlement harmed the ability of Mirowski to recover the benefits it had bargained for under its prior agreements with Boston Scientific.

241. As a result, Mirowski suffered damages, including the amount of its interest in the lost value of the claims Defendants forfeited in the Secret Settlement.

242. But for the Secret Settlement, Mirowski would have pursued and been awarded the damages described herein.

243. In the alternative, but for the Secret Settlement, Mirowski could have settled its disputes with St. Jude for a more lucrative amount than the amount actually received.

### Fifth Counterclaim
#### (Breach of Fiduciary Duty – Improper Settlement)

244. Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

245. Pursuant to the terms of the 1973 and 2004 Licenses, a contractual joint venture was formed between Mirowski and Defendants with respect to any litigation that Defendants elected to undertake. The joint venture agreement between the parties regarding the litigation imposed a contractual fiduciary duty on Defendants to look after Mirowski's interests in any such litigation.

246. Under the terms of the 1973 and 2004 Licenses, Mirowski and Defendants shared mutual interests in the potential profits of litigation and shared risks. Mirowski and Defendants pursued these interests through mutual control of litigation to

enforce rights under the Mirowski Patents, with the intent to share the profits that resulted from that joint venture. Thus, Defendants became agents of Mirowski.

247. As Mirowski's agent under the joint venture, a fiduciary relationship existed between Defendants and Mirowski.

248. Because the terms of the Licenses allowed Defendants to bring actions on behalf of both Mirowski and Defendants against infringers, Mirowski relied on the good faith and integrity of Defendants.

249. Mirowski understood, pursuant to the terms of the Licenses and their Joint Venture agreement, that Defendants would protect Mirowski's interests in litigation against St. Jude.

250. Defendants breached the contractual fiduciary duty they owed to Mirowski by agreeing to the Secret Settlement, which benefited Defendants at the expense of Mirowski.

251. Defendants breached the contractual fiduciary duty they owed to Mirowski by opportunistically using its own misdeeds in the Indiana Litigation and the resulting negative rulings by the Court to cease payments to Mirowski and expand the scope of these negative rulings by leveraging the value of Mirowski's cases to obtain additional agreements with St. Jude that harmed Mirowski's interests and benefitted Defendants.

252. Defendants breached the contractual fiduciary duty they owed to Mirowski by failing to make truthful disclosures to Mirowski of their negotiations and agreement with St. Jude.

253. On information and belief, Defendants intentionally and maliciously breached their contractual fiduciary duty to Mirowski in their conduct related to the Secret Settlement.

254. As a result, Mirowski suffered breach of contract damages in the amount of its interest in the lost value of the claims Defendants forfeited in the Secret Settlement, lost value that Defendants wrongfully used as leverage to gain significant financial and other benefits in unrelated litigation.

255. But for the Secret Settlement, Mirowski would have pursued and been awarded the damages described herein.

256. In the alternative, but for the Secret Settlement, Mirowski could have settled its disputes with St. Jude for a more lucrative amount than the amount actually received.

### Sixth Counterclaim
### (Unjust Enrichment)

257. Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

258. Boston Scientific received a measurable benefit from the Secret Settlement with St. Jude. Boston Scientific avoided further embarrassment, reputational damage, and financial loss regarding the conduct of its officers during the Indiana Litigation with respect to Dr. Bourland's testimony.

259. Boston Scientific also received additional value by settling four claims not related to Mirowski as part of the Secret Settlement.

260.   In exchange for settling the four unrelated claims against it, Boston Scientific received less value for the two claims that related to Mirowski's interests.

261.   In exchange for the benefits received, Boston Scientific gave up more than $568 million worth of potential claims that Boston Scientific and Mirowski were jointly pursuing.

262.   As a result, the value of Defendants' enrichment from the Secret Settlement is at least $568 million.

263.   But for the Secret Settlement, Mirowski would have pursued and been awarded the damages described herein.

264.   In the alternative, but for the Secret Settlement, Mirowski could have settled its disputes with St. Jude for a more lucrative amount than the amount actually received.

265.   Allowing Boston Scientific to retain the $568 million worth of benefits that it received from St. Jude would be unjust. Mirowski expected to receive payment for St. Jude's infringement, yet Boston Scientific bargained away Mirowski's claims for its own benefit.

266.   As a result, Mirowski suffered damages in the amount of its interest in the lost value of the claims Boston Scientific forfeited in the Secret Settlement.

### Seventh Counterclaim
### (Constructive Fraud)

267.   Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

268.   A fiduciary relationship existed between Defendants and Mirowski as a result of the joint venture and relationship between the parties.

269.   Defendants violated their obligation to deal fairly by negotiating with St. Jude (including leveraging the value of Defendants' and Mirowski's joint venture) and reaching an agreement against Mirowski's interests, as well as remaining silent in its communications with Mirowski about its negotiations and settlement with St. Jude.

270.   On information and belief, these actions were undertaken with gross negligence or malice toward Mirowski.

271.   Mirowski justifiably relied on Defendants' representations concerning the litigation against St. Jude and its silence regarding negotiations with St. Jude.

272.   Defendants gained an advantage for themselves as a result of their settlement with St. Jude.

273.   As a result, Mirowski suffered damages in the amount of its interest in the lost value of the claims Defendants forfeited in the Secret Settlement.

274.   But for the Secret Settlement, Mirowski would have pursued and been awarded the damages described herein.

275.   In the alternative, but for the Secret Settlement, Mirowski could have settled its disputes with St. Jude for a more lucrative amount than the amount it actually received.

276. Mirowski is entitled to punitive damages as a result of the constructive fraud perpetrated by Defendants.

### Eighth Counterclaim
### (Disgorgement of Profits)

277. Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

278. A fiduciary relationship existed between Defendants and Mirowski as a result of the joint venture and relationship between the parties.

279. Defendants deliberately breached their obligations to Mirowski by reaching a Secret Settlement with St. Jude and by remaining silent in their communications with Mirowski about their negotiations and settlement with St. Jude.

280. This deliberate breach of contract resulted in profits to Defendants.

281. The available damage remedies to Mirowski may offer inadequate protection to Mirowski's contractual entitlement. The available damages may not permit Mirowski to acquire a full equivalent to the promised performance.

282. As a result, as an alternative remedy, Mirowski has a claim for restitution of any profit realized by the Defendants as a result of their breach. In this case, that includes any gains to the Defendants by way of saved expenditures, settlement or damage verdicts avoided, injunctions avoided and other consequential gains that Defendants would not have realized but for their breach.

### Ninth Counterclaim
#### (Negligence)

283.    Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

284.    Under the terms of their agreements and/or as a result of the joint venture between Boston Scientific and Mirowski, Defendants owed a duty to Mirowski to conduct the Indiana Litigation using the same care that an ordinary plaintiff would.

285.    Defendants knew or should have known that their failure to act reasonably would harm Mirowski.

286.    Defendants' negligence and indeed, gross negligence, included sponsoring Dr. Bourland's untrue testimony and entering the Secret Settlement with St. Jude to protect Defendants from the repercussions of their and their expert's conduct.

287.    The results of Defendants' negligence and indeed, gross negligence, are the lost value in the Indiana Litigation, as well as Mirowski's interest in the lost value of the claims Boston Scientific forfeited in the Secret Settlement.

### Tenth Counterclaim
#### (Breach of Contract – Attorneys' Fees and Costs in the Medtronic Action in Delaware)

288.    Mirowski incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

289.    The 1973 License and 2004 License (collectively, "Licenses") are binding, enforceable contracts between Defendants and Mirowski.

290.    Under the Licenses between Defendants and Mirowski, Defendants are financially responsible for ensuring that sublicensees pay Mirowski a 3% royalty.

The Licenses require Defendants to defend and pursue actions, such as the Medtronic Action in Delaware.

291.   Mirowski performed, and at all times stood and stands ready to perform its obligations under the Licenses.

292.   Defendants have breached their agreement with Mirowski by failing to pay the attorneys' fees, costs, and other litigation expenses that have been incurred.

293.   As a result, Mirowski has been damaged by the amount spent on legal fees, costs, and other litigation expenses in that action, currently in excess of $5 million and mounting.

WHEREFORE, Plaintiff Mirowski prays that this Court grant the following relief:

A.   Money damages against Defendants, plus interest (including prejudgment interest);

B.   Punitive damages for Defendants' willful and wanton misconduct; acts of fraud, malice; gross negligence; breaches of fiduciary duties; and oppression against Mirowski;

C.   A declaration that Defendants have breached their obligation under the 1973 and 2004 Licenses, 2004 Agreement, and the Joint Venture between the parties;

D.   Mirowski's costs and attorney's fees in this action and prior litigation in *Mirowski Family Ventures, LLC v. Boston Scientific Corp., et al.*, Case No. 1:11-cv-00736 (S.D. Ind.); and

E.   Such other and further relief as this Court may deem just and proper.

54

## JURY DEMAND

Plaintiff seeks a trial by jury as to all counts triable by a jury.

Respectfully submitted,

Bruce R. Genderson
David C. Kiernan
Liam J. Montgomery
William E. Schurmann
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005
202-434-5000 (tel.)
202-434-5029 (fax)

*Attorneys for Plaintiff*

## MD. RULE 1-313 CERTIFICATE

The undersigned counsel hereby certifies that he is a member in good standing of the Maryland Bar.

Liam J. Montgomery